Charlette A. KARNS, individually, and as mother and next friend of Donald Wayne Pearce, Plaintiff-Appellee,

v.

EMERSON ELECTRIC CO., a Missouri corporation, Defendant-Appellant.

No. 85–1576.

United States Court of Appeals, Tenth Circuit.

May 1, 1987.

Rehearing Denied June 29, 1987.

Barbara Wrubel of Skadden, Arps, Slate, Meagher & Flom, New York City (Richard C. Honn of Rogers, Honn & Associates, Tulsa, Okl., with her on the brief) for defendant-appellant.

Steven R. Hickman (James E. Frasier also of Frasier & Frasier, on the brief), Tulsa, Okl., for plaintiff-appellee.

Before LOGAN and SEYMOUR, Circuit Judges, and BROWN, District Judge.[*]

LOGAN, Circuit Judge.

This is a products liability case, in which jurisdiction is based upon diversity of citizenship. Defendant, Emerson Electric Company, is appealing a $2,000,000 judgment entered in favor of plaintiff Charlette A. Karns, individually and as mother and next friend of Donald Wayne Pearce. On appeal, defendant argues that the evidence was insufficient as a matter of law on (1) causation, (2) the defectiveness and dangerousness of the product, and (3) fault sufficient to permit punitive damages. Defendant also alleges that certain rulings by the district court were erroneous and preju-dicial, and that the jury's award of compensatory damages was excessive.

Defendant manufactured and sold a product called the "Weed Eater Model XR-90," a multipurpose weed-trimming and brush-cutting device. The XR-90 consists of a hand-held gasoline-powered engine connected to a long drive shaft at the opposite end of which various cutting tools may be attached. *See* Appendix A. One tool sold by defendant for use with the XR-90 is a ten-inch circular steel saw blade capable of cutting through growth "up to 2″ in diameter." R. II, Def.Ex. 3 at 12. With the only blade guard available for the XR-90 in place, approximately 270° of the blade's edge is exposed during use.

The accident giving rise to this lawsuit occurred while Donald Pearce, then thirteen years old, was helping his uncle, Martin Karns, clean up an overgrown yard. Pearce was picking up trash while Karns operated an XR-90 with the circular saw blade attached. Pearce had stooped to pick up something approximately six to ten feet behind and slightly to the left of Karns when, according to Karns, the blade of the XR-90 struck something near the ground which caused the machine to swing violently around to Karns' left, cutting off Pearce's right arm above the elbow.[1]

At trial, plaintiff argued that the XR-90's propensity to "kickback" when the blade strikes something it cannot cut, together with defendant's failure to provide adequate warnings concerning this phenomenon, rendered the XR-90 defective and unreasonably dangerous. Additionally, plaintiff argued that defendant's knowledge of the kickback phenomenon, and its failure to take steps to reduce the hazard, justified an award of punitive damages. The jury awarded plaintiff $1,000,000 compensatory damages and $1,000,000 punitive damages. Defendant appeals from the dis-

---

[*] The Honorable Wesley E. Brown, Senior United States District Judge for the District of Kansas, sitting by designation.

1. Pearce's arm was successfully reattached within hours after the incident. Through two subsequent surgical procedures, physical therapy, and use of a prosthetic device, Pearce has regained considerable sensation and mobility in his right hand and arm. Incomplete nerve recovery has, however, limited Pearce's use of his right hand and left it with a noticeable claw deformity.

trict court's denial of its alternative motions for judgment n.o.v. or new trial.

## I

Under Oklahoma law, a plaintiff must prove three elements to recover on a theory of manufacturer's product liability: (1) the product was the cause of the injury; (2) a causally related defect existed in the product at the time it left the manufacturer's possession and control; and (3) the defect made the product unreasonably dangerous to the plaintiff or his property. *Kirkland v. General Motors Corp.*, 521 P.2d 1353, 1363 (Okla.1974); *Hurd v. American Hoist & Derrick Co.*, 734 F.2d 495, 499 (10th Cir.1984). A product is unreasonably dangerous if it is " 'dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.' " *Kirkland,* 521 P.2d at 1362–63 (quoting *Restatement (Second) of Torts* § 402A comment i (1965)). Punitive damages may be assessed against a manufacturer whose conduct reflects *"reckless disregard* for the public safety." *Thiry v. Armstrong World Industries,* 661 P.2d 515, 518 (Okla. 1983) (emphasis in original).

> "To meet this standard the manufacturer must either be aware of, or culpably indifferent to, an unnecessary risk of injury. Awareness should be imputed to a company to the extent that its employee[s] possess such information. Knowing of this risk, the manufacturer must also fail to determine the gravity of the danger or fail to reduce the risk to an acceptable minimal level. 'Disregard for the public safety' reflects a basic disrespect for the interests of others."

*Id.* at 518–19.

■ Defendant contends that the evidence was insufficient as a matter of law to permit the jury to find that (1) the product was defective and unreasonably dangerous; (2) the alleged defect caused Pearce's injury; or (3) defendant acted with reckless disregard for the public safety. At the close of plaintiff's evidence, defendant moved for a directed verdict on the grounds that the evidence was insufficient to establish causation or recklessness. Defendant did not, at that time, challenge the sufficiency of the evidence with regard to the "defective" and "unreasonably dangerous" elements.[2] The district court denied the motion, and defendant then presented the testimony of its expert witness, Ronald Loyd. At the conclusion of Loyd's testimony, defendant rested its case without renewing its motion for directed verdict.

Following the jury's verdict in favor of plaintiff and the entry of judgment in accordance with the verdict, defendant filed its motion for judgment n.o.v., stating numerous grounds including those raised on appeal. The district court denied this motion by minute order.

■ As a general rule, a defendant's motion for directed verdict made at the close of the plaintiff's evidence is deemed waived if not renewed at the close of all the evidence; failure to renew that motion bars consideration of a later motion for judgment n.o.v. *Ingram v. Hallman,* 330 F.2d 453, 454 (10th Cir.1964); *Fleming v. Lawson,* 240 F.2d 119, 120–21 (10th Cir.1956); *Halsell v. Kimberly-Clark Corp.,* 683 F.2d 285, 294 (8th Cir.1982), *cert. denied,* 459 U.S. 1205, 103 S.Ct. 1194, 75 L.Ed.2d 438 (1983); *see also Peterson v. Hager,* 724 F.2d 851, 854 (10th Cir.1984). Failure to renew the motion thus prevents a defendant from challenging the sufficiency of the evidence on appeal. *Ingram,* 330 F.2d at 454; *Fleming,* 240 F.2d at 120–21.

---

**2.** Grounds not raised in support of a motion for directed verdict may not later be raised in a motion for judgment n.o.v. *Bonjorno v. Kaiser Aluminum & Chem. Corp.,* 752 F.2d 802, 814 (3d Cir.1984), *cert. denied,* — U.S. —, 106 S.Ct. 3284, 91 L.Ed.2d 572 (1986); *Mozingo v. Correct Mfg. Corp.,* 752 F.2d 168, 172 (5th Cir.1985); *see also United States v. Fenix & Scisson, Inc.,* 360 F.2d 260, 265–66 (10th Cir.1966) (motion for

judgment n.o.v. "may not enlarge or assert new matters not presented in the motion for directed verdict," but technical precision not required), *cert. denied,* 386 U.S. 1036, 87 S.Ct. 1474, 18 L.Ed.2d 599 (1967). Therefore, Emerson is precluded from arguing at this stage of the litigation that the district court erred in submitting the issues of defect and unreasonable danger to the jury.

We have recently joined other circuits in recognizing an exception to the general rule in limited circumstances. In *Armstrong v. Federal National Mortgage Association,* 796 F.2d 366 (10th Cir.1986), we held that a defendant's failure to move for directed verdict at the close of all the evidence did not bar consideration of a later motion for judgment n.o.v. when (1) the defendant moved for directed verdict at the close of the plaintiff's evidence; (2) the trial court, in ruling on the motion, somehow indicated that renewal of the motion would not be necessary in order to preserve the issues raised; and (3) the evidence introduced after the motion was brief. *Id.* at 370; *accord Ebker v. Tan Jay International, Ltd.,* 739 F.2d 812, 823–25 (2d Cir. 1984) (noting that the proper test under the third element should be whether subsequent evidence "was of such a character that the opposing party ... could reasonably have thought that the moving party's initial view of the insufficiency of the evidence had been overcome and there was no need to produce anything more in order to avoid the risk of judgment n.o.v."); *Halsell,* 683 F.2d at 294; 5A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 50.08 at 50–79 (1986).

In this case, the district court gave no indication in denying defendant's motion for directed verdict that it intended to reserve consideration of the issues raised. The court simply said: "I find that minds of reasonable persons could differ as to the conclusions to be drawn; therefore, your motion will be overruled. Thank you." R. V, 239. Although the Seventh Circuit has held that an express reservation of action by the trial judge is not always necessary in order to invoke the above exception, *McKinnon v. City of Berwyn,* 750 F.2d 1383, 1390 (7th Cir.1984), we think the rule expressed in *Armstrong* strikes the proper balance between the need for adherence to the federal rules of procedure and the principle of liberal construction. Because defendant did not properly renew the motion for a directed verdict, and the *Armstrong* exception does not apply, defendant may not now challenge the district court's denial of defendant's motions for a directed verdict and judgment n.o.v., and may not challenge the sufficiency of the evidence on appeal.

## II

Defendant argues, in the alternative, that the lack of *any* competent evidence on the elements required for manufacturer's product liability under Oklahoma law mandates reversal of the district court's denial of its motion for new trial. In reviewing the district court's ruling on this motion, we do not make a de novo determination of the sufficiency or weight of the evidence. Rather, our inquiry is limited to whether the district court's refusal to set aside the jury's verdict constituted a manifest abuse of its discretion. *Brown v. McGraw-Edison Co.,* 736 F.2d 609, 616 (10th Cir.1984); *see also Harris v. Quinones,* 507 F.2d 533, 535 (10th Cir.1974) (district court's grant or denial of motion for new trial made on the ground that the verdict is against the weight of the evidence will not be reversed absent an "unusual situation" or a "gross abuse of discretion"). Reversal is appropriate only when the verdict is "clearly, decidedly, or overwhelmingly" against the weight of the evidence. *Brown,* 736 F.2d at 616–17.

## A

Defendant argues that the evidence indisputably establishes that the kickback phenomenon could not possibly have caused Pearce's injury. Defendant reads Martin Karns' testimony as stating that the kickback occurred when the edge of the blade farthest away from him—i.e., at the "twelve o'clock position"—hit an object in the weeds directly in front of him. Because the blade spins in a counter-clockwise direction on a horizontal plane, resistance encountered at the twelve o'clock position would necessarily tend to cause the unit to kickback or bounce to the right, not to the left as Karns described the incident. Karns testified, however, that he did not know what the blade hit that caused it to

kick back.[3] The only thing Karns recalled with certainty was that the brushcutter was directly out in front of him when the kickback occurred. Had the blade in fact contacted an object at the six o'clock rather than the twelve o'clock position, any kickback or bounce would have been to the left, as Karns described it.

Karns' description of the force of the kickback phenomenon was corroborated by the plaintiff's expert, Robert Block, who performed his own tests on the XR–90. Block testified that under some circumstances "the blade was capable of swinging around through an arc that could easily have been almost a half circle, and that it was hard to control it to bring it back." R. V, 205. Defendant's expert, Ronald Loyd, while disputing the likelihood of such a violent kickback, did not deny the possibility of such an occurrence. On the basis of this evidence, we think the jury was justified in finding that the accident occurred as Karns described it.

### B

 Since there is sufficient evidence to support plaintiff's version of the accident, we are easily persuaded that a device with an exposed metal sawblade capable of suddenly flinging itself through an uncontrolled, 180 degree arc poses a danger to bystanders like Pearce that exceeds the expectations of the ordinary consumer. *See Smith v. United States Gypsum Co.,* 612 P.2d 251, 253 (Okla.1980). Defendant argues that plaintiff failed to establish the feasibility of safer, alternative designs, or that the danger of the XR–90 as designed outweighs its utility. While evidence bearing upon design alternatives and the "state of the art" in the industry may be relevant to determining whether a product is unreasonably dangerous, *Robinson v. Audi NSU Auto Union Aktiengesellschaft,* 739 F.2d 1481, 1485–86 (10th Cir.1984); *Bruce v. Martin-Marietta Corp.,* 544 F.2d 442, 447 (10th Cir.1976), such evidence is not an essential element of the plaintiff's case. *Cf. Smith v. Minster Machine Co.,* 669 F.2d 628, 633 (10th Cir.1982) (compliance with industry standards does not constitute an absolute defense in a products liability action). Moreover, Block did testify that the force of the kickback could be substantially reduced by reducing the speed or mass of the blade. Although such modifications would, no doubt, reduce the XR–90's effectiveness as a cutting tool, we cannot say, as a matter of law, that the utility of the machine as designed justifies the risk associated with its use.

Although the existence of warnings might render an otherwise dangerous product not unreasonably so, here there was a basis for the jury to conclude that the warnings and instructions accompanying the XR–90 were inadequate to overcome its inherent danger. A list of twenty-four "Safety Rules and Precautions" appears on page three of the owner's manual accompanying the XR–90. Number fifteen states: "Keep children away. All people and pets should be kept at a safe distance from the work area, at least 30 feet, especially when using the blade." R. II, Def.Ex. 3 at 3. Page twelve, dealing with the brushcutter attachment, refers to the "bounce" phenomenon in the following terms:

> "Cutting with a dull blade, feeding the blade too rapidly into a large diameter tree or trying to cut when the blade is turning too slowly will cause the blade to 'bounce' away from what is being cut. Always be prepared for this to happen. Always keep both feet spread apart in a comfortable stance and yet braced for the unit's 'bounce.'"

*Id.* at 12.

 A manufacturer cannot defend on the basis that perfect compliance with its instructions would have prevented the accident when the warnings given are "unclear or inadequate to apprise the consumer of the inherent or latent danger."

---

**3.** Karns testified that the blade might have hit a small piece of wood that he discovered upon returning to the scene after the accident. Karns was asked to reproduce a diagram drawn at his deposition in which he indicated that the piece of wood was located nearest to the twelve o'clock position on the blade. This evidence is less than convincing, however, in light of Karns' obvious uncertainty regarding what the blade actually hit.

*Smith v. United States Gypsum Co.*, 612 P.2d 251, 253 (Okla.1980) (warning on adhesive product to "open windows and doors" and "use only with cross ventilation" held inadequate when manufacturer should have known that some consumers would use product in a room without windows). In addition, the effectiveness of a warning or instruction is likely to be somewhat diminished when, as here, the risk created by the product extends to bystanders who have no access to such warnings or instructions.[4] We think the jury could reasonably have concluded that the warnings given were inadequate to apprise consumers of the XR–90's violent kickback potential.

### C

■ Defendant also asserts that the record is devoid of *any* evidence to support a claim of punitive damages under Oklahoma law. Defendant does not contend that the amount of punitive damages awarded was excessive. *See Silkwood v. Kerr-McGee Corp.*, 769 F.2d 1451, 1460 (10th Cir.1985) (under Oklahoma law defendant's wealth and the risk created by its conduct are substantial factors to be considered in calculating punitive damages), *cert. denied,* — U.S. ——, 106 S.Ct. 1947, 90 L.Ed.2d 356 (1986). Nor did it object to the trial court's instructions on punitive damages, which were based on the "reckless disregard" standard set out in *Thiry v. Armstrong World Industries*, 661 P.2d at 518. *See supra* part I.

We are unable to say that the district court manifestly abused its discretion in denying defendant's motion for a new trial. Defendant admits that the evidence established that:

"(1) because of its expertise in the chain saw industry, Emerson knew or must have known that the brushcutter's ability to bounce would potentially expose by-

standers to the risk of injury in the event of accidental contact with the exposed part of the blade; and (2) despite this knowledge, Emerson did not implement an alternative safer design or take the brushcutter off the market after it learned of a prior lawsuit involving injury to a young boy allegedly caused by a bounce or 'kickback' accident."

Brief for Defendant-Appellant at 32.

Conceding this, defendant urges upon us the language in *Thiry* that "[t]he manufacturer must also be able to make the product safer." 661 P.2d at 517. It argues that the risk that makes the product dangerous is an "absolutely essential feature" of its utility. Brief for Defendant-Appellant at 33. It urges us to adopt Professor David Owen's view that punitive damages may be awarded in a products liability case only for fraudulent behavior, or when the risk "could easily be avoided through feasible and economical curative measures." Owen, *Problems in Assessing Punitive Damages Against Manufacturers of Defective Products*, 49 U.Chi.L.Rev. 1, 27 (1982). Despite the fact that another article by Professor Owen was cited with approval in *Thiry*, 661 P.2d at 519 n. 11 (citing Owen, *Punitive Damages in Products Liability Litigation*, 74 Mich.L.Rev. 1258 (1976)), we do not believe the Oklahoma Supreme Court would wholly accept this formulation.[5] Such a rule would deny punitive damages as a matter of law with respect to an extremely dangerous product unless modifications that would prevent the injury were easy and cheap to make. It would deny the jury the right to say any product was inherently too dangerous to be sold to the general public. We do not have to reach that issue, however, because plaintiff did present evidence of an inexpensive and easy modification that would reduce accidents—a better warning, using stronger words and better specifying the zone of

---

**4.** Although Karns testified that he told Pearce to stay away from him while he was using the XR–90, Pearce did not recall receiving such a warning.

**5.** Owen recommends allowing punitive damages only for a manufacturer's "flagrant indifference

to the public safety," but admits that the courts have opted instead to use more traditional standards, including the "reckless disregard for the public safety" standard adopted by the Oklahoma Supreme Court in *Thiry. See* Owen, *supra,* 49 U.Chi.L.Rev. at 21.

potential danger to bystanders. Plaintiff also presented expert testimony that accidents could be reduced by slowing the speed of the blade and reducing its mass. Defendant complains that would unreasonably reduce the efficiency of the saw blade. But we think Oklahoma courts would find the evidence in the case before us sufficient to submit a punitive damages issue to the jury.

### III

### A

Defendant argues that the district court erred in permitting plaintiff's expert, Robert Block, to testify that the XR-90 was "unreasonably dangerous beyond the expectation of the average user," R. V, 196–97, and that "Emerson acted recklessly" in producing and distributing it. R. V, 212. Fed.R.Evid. 704(a) provides that an expert's opinion testimony "is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Opinions embracing legal standards may, however, be excluded for other reasons, such as the likelihood of jury confusion, the danger of unfair prejudice, or the inability of such evidence to assist the trier of fact. *See* Fed.R.Evid. 403, 702; *Strong v. E.I. DuPont de Nemours Co.,* 667 F.2d 682, 685–86 (8th Cir.1981) (district court did not err in excluding expert's testimony that product was "unreasonably dangerous"). These are matters committed to the trial court's discretion, and we review a decision admitting or excluding such testimony only for abuse of that discretion. *See, e.g., Aspen Highlands Skiing Corp. v. Aspen Skiing Corp.,* 738 F.2d 1509, 1523 (10th Cir. 1984), *aff'd,* 469 U.S. 585, 105 S.Ct. 2847, 83 L.Ed.2d 503 (1985); *Strong,* 667 F.2d at 685.

Here, the most that can be said is that the testimony defendant challenges was not helpful to the jury in deciding the case, since the expert was, in effect, merely telling the jury what result to reach on two of the elements of plaintiff's case. We do not believe, however, that the jury is likely to have been confused or misled by this testimony. Indeed, the facts were of a sufficiently technical nature that expert testimony could be expected to assist the jury in deciding the case. In both instances, Block explained the bases for his opinions in sufficient detail to permit the jury to independently evaluate his conclusions. The legal terms used are not so complex or shaded with subtle meaning as to be beyond the understanding of the average person, *see United States v. Johnson,* 637 F.2d 1224, 1246–47 (9th Cir.1980), and Block's use of those terms did not conflict with the court's instructions. *See* 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 704[02] (1985). Finally, the court instructed the jury that it was free to entirely disregard an expert's opinion "if you should conclude that the reasons given in support of the opinion are not sound." R. V, 310–11. We do not believe that the jury was "prevailed upon to abdicate its function or responsibility for reaching an independent judgment on the ultimate issues" in the case. *Frase v. Henry,* 444 F.2d 1228, 1231 (10th Cir.1971). We therefore conclude that the district court's admission of this evidence was within its discretion.

### B

Defendant argues that the district court erred in admitting evidence of a prior lawsuit, while excluding evidence of the jury's verdict in that lawsuit.[6] Defendant

---

**6.** Plaintiff called defendant's expert, Ronald Loyd, to the stand during plaintiff's case-in-chief. Loyd, a former employee of defendant, gave the following testimony concerning the "Stephens" case:

"Q. Okay. Now, then, before Donald Pearce was injured on the 1st day of August—1st day of November, 1981, did you, Emerson Electric Company have knowledge of similar accidents having occurred?

A. I had knowledge of alleged accidents having occurred.

Q. Okay. In fact, one of those involved either kickback or bounce; isn't that right? Allegedly kickback or bounce?

A. Allegedly it did.

Q. All right. And it allegedly was a kickback or a bounce of a period of about—a distance of about six feet, wasn't it?

A. That's what was alleged, but the jury didn't think so.

argues that this evidence should have been excluded as irrelevant, because the prior case involved a different product and occurred under circumstances different from the case at bar. Defendant, however, did not object to this evidence at trial.[7] In the absence of plain error, defendant's failure to object precludes it from raising this issue on appeal. Fed.R.Evid. 103(a)(1) and (d); *Whiteley v. OKC Corp.,* 719 F.2d 1051, 1057 (10th Cir.1983).

■ Ordinarily, admission of testimony regarding prior accidents or complaints is "predicated upon a showing that the circumstances surrounding them were substantially similar to those involved in the present case." *Rexrode v. American Laundry Press Co.,* 674 F.2d 826, 829 n. 9 (10th Cir.), *cert. denied,* 459 U.S. 862, 103 S.Ct. 137, 74 L.Ed.2d 117 (1982). Plaintiff contends, and defendant does not dispute, that the product involved in the Stephens case was substantially similar to the XR–90. The allegations regarding kickback also appear to have been similar,[8] although Loyd later testified that "operator error," not kickback, had caused injury in the Stephens case, R. V, 258.

■ We cannot say that admission of the evidence of the earlier case constituted plain error. The plain error exception in civil cases has been limited to errors which seriously affect " 'the fairness, integrity or public reputation of judicial proceedings.' " *Aspen Highlands Skiing Corp.,* 738 F.2d at 1516 (quoting *Rowe International, Inc. v. J–B Enterprises, Inc.,* 647 F.2d 830, 835 (8th Cir.1981)). We think the jury was capable of attaching the appropriate weight

to the testimony at issue and of rendering a fair and impartial verdict.

We agree with the district court's refusal to allow testimony concerning the jury's verdict in the Stephens case. Aside from the tendency of such evidence to form an improper basis for decision in the instant case, *cf. Johnson v. Colt Industries Operating Corp.,* 797 F.2d 1530, 1534 (10th Cir. 1986) (error to admit judicial opinion in prior case involving same product), the outcome is unimportant to defendant's knowledge of the circumstances surrounding the prior accident.

**IV**

■ Finally, defendant argues that the jury's award of $1,000,000 compensatory damages was excessive. This circuit has consistently held that "absent an award so excessive or inadequate as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial, the jury's determination of [damages] is considered inviolate." *Barnes v. Smith,* 305 F.2d 226, 228 (10th Cir.1962); *accord Aspen Highlands Skiing Corp.,* 738 F.2d at 1526; *Blevins v. Cessna Aircraft Co.,* 728 F.2d 1576, 1579 (10th Cir.), *cert. dismissed,* 468 U.S. 1228, 105 S.Ct. 32, 82 L.Ed.2d 923 (1984). Moreover, the trial court's denial of defendant's motion for new trial or remittitur is entitled to considerable deference on appeal, and will not be disturbed absent a gross abuse of discretion. *Blevins,* 728 F.2d at 1579; *Whiteley v. OKC Corp.,* 719 F.2d 1051, 1058 (10th Cir.1983).

---

Q. Now, are you going to tell these ladies and gentlemen that the Stephens boy's legs were not cut?
A. No, sir.
Q. They were cut, weren't they?
A. Yes, it was."
R. V, 137–38.

7. Defendant did file an objection to the inclusion, in the pretrial order, of Plaintiff's Exhibit No. 12, apparently consisting of various pleadings filed in the Stephens case. Although the court overruled this objection, plaintiff did not attempt to use the exhibit at trial.

8. The fact that a prior lawsuit against the defendant involved allegations substantially sim-

ilar to those in the present case has at least some tendency to show that defendant was on notice concerning possible defects in its product. *See Worsham v. A.H. Robins Co.,* 734 F.2d 676, 688–89 (11th Cir.1984); *Kehm v. Procter & Gamble Mfg. Co.,* 724 F.2d 613, 625–26 (8th Cir.1983) (dissimilarities in prior consumer complaints affect weight, not admissibility of evidence). *But see Yellow Bayou Plantation, Inc. v. Shell Chemical, Inc.,* 491 F.2d 1239, 1242–43 (5th Cir.1974) (evidence of prior lawsuits had "such faint probative value and high potential for unfair prejudice" that its exclusion was well within trial court's discretion).

Although the verdict in this case greatly exceeds the easily quantifiable elements of damage established at trial,[9] our judicial consciences are not shocked by the jury's estimate of the amount needed to compensate Pearce for his physical and emotional pain and suffering. Before his injury, Pearce was right handed. Nerve damage and resultant loss of grip have now rendered Pearce's right hand virtually useless in performing even the most mundane physical tasks (e.g., dressing, bathing, opening containers). Pearce's three operations have left noticeable scars on his body, and the claw deformity of his right hand causes people to stare at him in public.

The jury is particularly qualified to consider and evaluate the social problems which a boy who was thirteen at the time of the injury has experienced and is likely to experience as a result of such a disability.

Nothing in the record indicates that the jury's verdict was based on passion, prejudice, or other impermissible considerations. Although the verdict in this case may exceed what we or another jury would consider appropriate based on an independent review of the facts, we can see no principled basis for overturning this jury's decision and that of the district court.

AFFIRMED.

9. Plaintiff's past medical expenses amounted to about $15,000, and the treating physician testified that the need for future medical treatment cannot presently be determined. Although Pearce's injury has clearly resulted in diminished physical ability, plaintiff offered no direct evidence concerning lost wages or earning capacity.